UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                          :
CHRISTELIA NEAL                           :
                                          :
                    Plaintiff,            :        CASE NO. 1:08-CV-1194
                                          :
                                          :
vs.                                       :        OPINION & ORDER
                                          :        [Resolving Doc. Nos. 21, 25 & 26.]
FORD MOTOR COMPANY                        :
                                          :
                    Defendant.            :
                                          :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendant Ford Motor Company ("Ford") moves for summary judgment in this Title VII employment discrimination action. [Doc. 21, 26.]  Plaintiff Christelia Neal ("Neal") opposes this motion. [Doc. 25.]  For the following reasons, the Court **GRANTS** the Defendant's motion.

### I.  Background

Plaintiff Neal, a current employee of Defendant Ford who has been on medical leave since May 16, 2008, brought a Title VII suit against Ford, contending that she had been subject to discrimination on the basis of race and gender, retaliation, and a hostile work environment. [Doc. 1 at 4.]

Neal was hired by Ford on February 8, 1994 to work as an assembler at Ford's Walton Hills Stamping Plant.  [Doc. 21, Ex. 4 at 63.] Her work experience at this plant was positive. [*Id.* at 64.] In April 2002, Neal voluntarily transferred from the Walton Hills plant to the Monroe Stamping Plant located in Monroe, Michigan and owned and operated by Visteon – a separate company from

Case No. 1:08-CV-1194
Gwin, J.

Ford.  [*Id.* at 67-68.] Neal worked at the Monroe plant for approximately two years.  [*Id.* at 68.]

While working at the Monroe plant as a hi-lo driver, Neal alleged that she was discriminated on the basis of her gender.  [*Id.* at 69.] Specifically, Neal stated that her superior, Floyd Wiley, made the following comment to her while she was driving a forklift: "It's just like a woman not to be able to start a car."  [*Id.*] Neal also said that certain supervisors bet a thousand dollars that she would not be able to drive a forklift.  [*Id.* at 70.] Finally, Neal stated that she found items in the forklift she operated that she considered to be evidence of sex discrimination, including a queen of hearts playing card, a torn copy of Visteon's diversity policy, and a magazine with Jada Pinkett Smith on its cover.  [*Id.* at 70-73.] Neal did not report these incidents to Visteon or Ford.  [*Id.* at 70-72.]

Further, Neal alleged that she was harassed and was subject to a hostile work environment while working at the Monroe plant.  In addition to the abovementioned allegations, she contended that fellow plant employees tampered with her food, [*id.* at 19-22], and that she felt that her life was in danger based on the fact that a body found in a lake nearby the plant was rumored to be hers and the fact that a supervisor expressed concern for her welfare when she returned late from a lunch break, [*id.* at 27-30.]

Neal also stated that she was discriminated against on the basis of her race while at the Monroe plant, though she admitted that she has no facts to support this contention.  [*Id.* at 78.] Additionally, Neal alleged that she was subject to retaliation while working at the Monroe plant; she apparently attempted to file a lawsuit through a Michigan attorney and, as a result, the harassment and other acts she experienced at work worsened.  [*Id.*] Neal admitted that she ultimately did not file a lawsuit and that she had no specific proof that anyone knew that she was planning to file a lawsuit in connection with the activities at the Monroe plant.  [*Id.* at 78-79.]

-2-

Case No. 1:08-CV-1194
Gwin, J.

Based upon the above noted claims, as well as on some additional allegations,[1/] Plaintiff Neal filed a charge of sex and race discrimination (but not retaliation) against Visteon with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on June 28, 2005. [Doc. 21, Ex. 6 at 13.] On January 9, 2006, the EEOC informed Neal that it would discontinue the processing of the matter because "the information obtained during the investigation [did] not support a conclusion that the statute(s) complained of has/have been violated." [*Id.*]

In July 2004, Plaintiff Neal returned to Ohio to work at Ford's Lorain Assembly Plant, [Doc. 21, Ex. 4 at 4], taking advantage of a "flow-back" program that allowed Visteon employees to return to Ford, [Doc. 21, Ex. 5 at 67-68.] Neal alleged that the Ku Klux Klan ("KKK") (or its members) tracked her activities in Michigan, followed her from the Monroe plant to the Lorain plant, and "slander[ed] her name. [*Id.* at 146-147.] In support of this contention, which is part of her hostile work environment claim with respect to the Lorain plant, Neal described seeing graffiti in the phone booth of the Lorain plant that said: "KKK," "Mexicans rule over niggers," "If you like food, call soul food 1-800-eat shit," as well as other derogatory statements that Neal could not recall. [Doc. 21, Ex. 4 at 10.] The graffiti was removed two days after Neal reported seeing it. [*Id.* at 11.] Neal also stated that she found union campaign literature on a break room table that apparently referenced the KKK membership of an individual who was working at the Lorain plant. [*Id.* at 12-14.] Neal took this literature home, however, and did not report the incident to Ford's Labor Relations Department. [*Id.*

---

[1/] Neal also claimed that (1) her co-workers ran the assembly line at a slower pace than usual when she was present, [*id.* at 81-82]; (2) her co-workers used gestures as a code or signal to communicate about her, [*id.* at 73-75]; (3) she had second-hand knowledge that an unidentified employee was called a "nigger bitch," [*id.* at 83-84]; (4) she had second-hand knowledge that dog excrement was smeared on the car of an African-American employee, [*id.* at 86-87]; (5) there was a delay in the delivery of her W-2 form and incentive check, [*id.* at 84-86]; and (6) there was a delay in the approval of her "flow-back" application to return to Ford," [Doc. 21, Ex. 5 at 142-144.]

Case No. 1:08-CV-1194
Gwin, J.

at 14-15.]

Plaintiff Neal also claimed that while she was working at the Lorain plant, she was harassed by two plant supervisors – Kedrick Jones, an African-American male, and Jamie, a Caucasian female.  Neal contended that Jamie treated her like a floater by rotating her from job to job instead of  putting her into a permanent position at the plant, [*id.* at 6], and that Jamie gave her "a harder time than the other employees."  [*Id.*] Neal also stated that Jones told her that she should work more efficiently while she was holding a particular position instead of moving her to a position where her work performance could have been better.  [*Id.* at 7.]  Neal did not believe that either Jamie or Jones discriminated against her on the basis of Neal's sex or race, [*id.*]; instead, she believed that she was harassed and discriminated against because of her transferee status and because she had filed an EEOC charge against Visteon, even though she admitted to having no evidence that anyone holding a supervisory position at the Lorain plant knew of the charge.  [*Id.* at 136-138.] Further, Neal did not report Jamie's or Jones's allegedly harassing conduct to Ford.  [*Id.* at 9-10.]

When the Lorain plant closed in December 2005, Plaintiff Neal transferred to Ford's Ohio Assembly Plant ("OHAP") located in Avon Lake, Ohio; Neal was assigned to work on the instrument panel unit ("IPU") line.  [*Id.* at 15-16.] From January until May 2007, several of Neal's co-workers on the IPU line began to notice changes in Neal's behavior, causing them to worry that she would behave violently toward them.  [Doc. 21, Ex. 5 at 150; Doc. 21, Ex. 2 at 1-2.]   A relief person for the IPU line told Ford's Labor Relations Department that Neal accused him of being a racist because he was not available to relieve her at the time she wanted. [Doc. 21, Ex. 2 at 1.] A second IPU worker overheard Neal swearing to herself and saying "fuckin' whitey," [*id.*], while a third IPU worker said that Neal called him a "motherfucking white boy," [*id.* at 2.] Further, a forklift

-4-

Case No. 1:08-CV-1194
Gwin, J.

driver reported to Labor Relations that he felt threatened by the statements Neal made to him such

as "you wait and see what happens to you" and by her gestures including pointing to her eyes to

indicate she was watching him.  [*Id.* at 1.]

Although Plaintiff Neal was not disciplined as a result of these incidents, Melinda Brayo, a

Senior Labor Relations Representative at the Avon Lake plant, investigated the incidents and spoke

to Neal in May 2007.  [*Id.* at 2.] Without providing specific details, Neal stated that an event that

occurred in November 2006 made her feel differently about her co-workers.[2/] [*Id.*] She indicated that

the IPU line workers "had 'racial issues' and were working as a team against her . . . . [S]he [also]

felt that workers were walking near her station, putting the wrong labels on her units, and positioning

her stock and clusters in [a] manner that she considered [to be] improper."  [*Id.*] Following an

investigation, Labor Relations Representative Brayo was apparently unable to substantiate any of

Neal's allegations.  [*Id.*]

Upon request, Plaintiff Neal provided Labor Relations with a written account detailing her

allegations of a hostile work environment at the Avon Lake plant.[3/] [*Id.* at 15-17.] This statement

initially referenced previously described situations that took place at the Monroe and Lorain plants

and then described her belief that a pumpkin roll that she purchased from a forklift driver was

poisoned. [*Id.* at 16.] Neal also indicated that she was always being watched and that supervisors

eavesdropped on her conversations with other employees, particularly minority employees.  [*Id.*]

---

[2/] In her deposition, Neal stated that the November 2006 event was Neal's purchase of a pumpkin roll from a forklift driver that she believed to be poisoned. [Doc. 21, Ex. 4 at 17.] Neal had no evidence to substantiate her belief, however. [*Id.* at 19-20.]

[3/] Around this time, Neal began tape recording the conversations she had with her co-workers and with Labor Relations Representative Brayo. [*Id.* at 35.] She taped conversations throughout the day, every day she came to Ford, with a voice-activated tape recorder. [*Id.* at 45.] In all, Neal gathered 35 tapes containing such conversations. [*Id.*]

Case No. 1:08-CV-1194
Gwin, J.

In an addendum to the statement, Neal stated that she believed that there were "myriads of

Ku Klux Klan (KKK) members in Ford's facilities" and that she had second-hand knowledge of

employees using racial slurs at the Avon Lake plant. [*Id.* at 18.]  Neal also provided a list of

"activities that compose factors of harassment" including: (1) someone allegedly tampering with

Neal's car hood while she was at a union meeting on December 10, 2006; (2) cluster racks being

placed on the turn table incorrectly most of the time; (3) clusters protruding out of the rack most of

the time; (4) clusters being incorrectly labeled to confuse Neal; (5) employees walking in Neal's

work area; (6) an engineer taking Neal's picture after photographing clusters even though she told

him not to do so.[4/] [*Id.* at 18-19.]  Labor Relations Representative Brayo also apparently could not

substantiate any of these allegations or to determine that any of Ford's rules or policies had been

violated.  [*Id.* at 2.]

According to Labor Relations Representative Brayo, on June 4, 2007, Plaintiff Neal had a

disagreement with Betty Cordle, an IPU relief worker.  [*Id.* at 3.] Cordle apparently called Neal an

"idiot" twice because Neal got in Cordle's way when Cordle was replacing her on the line.  [*Id.*]

Neal also reported to Labor Relations Representative Brayo that the following day another of Neal's

co-workers, Constance Burd, pulled out of a parking space as if she was intending to hit Neal. [Doc.

21, Ex. 4 at 36.] On June 8, 2007, Neal had an altercation with Burd during which Neal kicked a box

---

[4/] In her deposition, Neal identified additional conduct occurring at the Avon Lake plant that she considered to be harassing and discriminatory in nature.  Neal claimed that when she ran for a position as an alternate committee-person with the union, an unidentified person suggested that she would have a better chance of winning if she ran for financial secretary.  [Doc. 21, Ex. 4 at 134.] She also stated that an employee (whose name she could not remember) told her that "women belong in the kitchen, barefoot and with a kid." [*Id.* at 122.] Finally, Neal claimed that an unidentified employee called her a "black bitch" and that she also observed another employee grab his genitals and said "fuck that bitch." [*Id.* at 131.] These incidents occurred in 2007.  She also heard from an African-American co-worker that a while employee stated "It's time to fuck with a nigger day" and another employee standing nearby responded "isn't that every day?"  [*Id.* at 107.]  Neal stated that she did not report any of these incidents or statements to Labor Relations because they were "trivial" and she "didn't take [them] to heart."  [*Id.* at 122-123.]

Case No. 1:08-CV-1194
Gwin, J.

at Burd, gestured in Burd's direction, and told Burd that she "deserved an ass-kicking." [Doc. 21,
Ex. 2 at 3; Doc. 21, Ex. 5 at 147-148.]

Following the exchange between Plaintiff Neal and Burd, Labor Relations Representative
Brayo met with one of the witnesses to the altercation and then spoke with Neal in the presence of
a UAW representative on June 14, 2007. [Doc. 21, Ex. 2 at 3.] Brayo asked Neal if she would be
willing to see Ford's plant physician, Dr. Collins, and Neal agreed to do so. [Id.] During that visit,
which also took place on June 14, 2007, Neal told Dr. Collins that she was experiencing problems
with her co-workers as a result of paranoia, that she had a history of paranoia, and that she was
currently being treated for paranoia and depression. [Id.; see also Doc. 21, Ex. 5 at 10-14.] Dr.
Collins recommended that Neal take a medical leave of absence to consult with her doctors about
these issues, which Neal agreed to do. [Id.] As a result, Neal commenced a medical leave of absence
effective at the end of her appointment with Dr. Collins.[5/] [Id.]

Plaintiff Neal returned to work from her medical leave of absence in July 2007. She resumed
her work on the IPU line, but she testified that her co-workers and the KKK were conspiring against
her. For example, Neal found pallets and boxes in her work area that had the letters "KK/KA"
stamped on them, apparently signifying a connection between the KKK and Ford. [Doc. 21, Ex. 4
at 100-101.] Additionally, Neal believed that her co-workers were again attempting to poison her,

---

[5/] Shortly after Neal was asked to take a medical leave of absence, on June 29, 2007, Neal filed her first charge
containing claims of race, sex, and disability discrimination and retaliation against Ford with the Ohio Civil Rights
Commission ("OCRC"). [Doc. 21, Ex. 4 at 89-91.] On August 6, 2007, Neal filed a second charge against Ford with
the OCRC alleging race discrimination, harassment, and retaliation. [Doc. 21, Ex. 5 at 36.] The OCRC was unable to
substantiate Neal's claims and both of the charges were dismissed on a finding of no probable cause. [Id. at 56.] On
February 15, 2008, the EEOC issued a letter adopting the findings of the OCRC. [Doc. 21, Ex. 6 at 36-40.] This letter
constituted a notice of dismissal and provided Neal with a right to sue within 90 days of her receipt of the letter. [Id. at
40.]

Case No. 1:08-CV-1194
Gwin, J.

this time with a fish sandwich.[6/] [*Id.* at 31.]

In August 2007, Plaintiff Neal was transferred from the IPU line to a job in the trim area of the plant. [Doc. 21, Ex. 5 at 23.] Her rate of pay, benefits, and other conditions of employment did not change as a result of the transfer. [Doc. 21, Ex. 2 at 4.] This reassignment followed Neal's accusations that several of her co-workers on the IPU line attempted to poison her, walked too close to her work station, and sabotaged her work; she had informed Labor Relations about these incidents prior to being transferred to the trim area. [Doc. 21, Ex. 5 at 25-26.] Nevertheless, Neal contends that this transfer was discriminatory because (1) Neal told Labor Relations Representative Brayo that she did not want to be reassigned; (2) her supervisor, Kedrick Jones, told Brayo that Neal was doing a great job on the IPU line; and (3) according to Neal, her contract stipulated that a Labor Relations representative was not supposed to reassign any employees, as this task was reserved for line supervisors. [*Id.* at 27.]

In October 2007, a supervisor removed Plaintiff Neal from a forklift job after employees complained about her confrontational and disruptive behavior and her use of profanity towards a co-worker. [Doc. 21, Ex. 4 at 42-43; Doc. 21, Ex. 5 at 49.] Although the supervisor offered Neal a forklift position in another area of the plant, Neal decided that she no longer wanted to drive a forklift and, instead, she became a floater. [Doc. 21, Ex. 5 at 50.] Neal's pay, benefits, and other conditions of employment were not affected by her move to a floater position. [*Id.* at 51.]

On May 15, 2008, Plaintiff Neal was once again asked to take a medical leave of absence

---

[6/] Neal took the sandwich to a lab for analysis. [Doc. 21, Ex. 4 at 32-33.] The analysis did not reveal that the sandwich was tainted. [*Id.* at 32.] Neal also contacted Channel 19 and Channel 5 News regarding the analysis of the sandwich, [*id.* at 49-51], and attempted to give the sandwich to the East Cleveland Police, [Doc. 21, Ex. 5 at 111.] Because the news stations did not return her phone calls, Neal stated that she believed that Ford attempted to cover up the alleged attempted poisoning. [*Id.* at 101-104.]

Case No. 1:08-CV-1194
Gwin, J.

from Ford.  [Doc. 21, Ex. 3, at 2.] This request followed a confrontation that Neal had with a relief

worker in April 2008 and with two employees from her work area on May 15, 2008, various

employee complaints about Neal's erratic behavior, and an incident during which Neal punched a

box while glaring at another employee.  [*Id.* at 2-3; *see also* Doc. 21, Ex. 4 at 128.] Neal met with

Dr. Collins on May 16, 2008 and told him that her work situation had not improved since she took

her first medical leave of absence in 2007; she also stated that her co-workers and the KKK were

plotting against her and attempting to get her fired.  [Doc. 21, Ex. 3, at 2.] Dr. Collins suggested that

Neal take another medical leave of absence to consult with her doctors, [*id.*], and Neal was "more

than willing" to do so.[7] [Doc. 21, Ex. 5 at 158.]

Plaintiff Neal has been on medical leave from Ford since May 16, 2008. [*Id.*] Although she

is still employed by Ford, Neal does not intend to return to work there. [*Id.*]

On March 30, 2009, Defendant Ford filed a motion for summary judgment, seeking a

determination that there was no genuine issue of material fact as to Plaintiff Neal's sex and race

discrimination, retaliation, and hostile work environment claims. [Doc. 21, 26.]  Plaintiff Neal

opposed Defendant Ford's motion for summary judgment on April 23, 2009. [Doc. 25.]  Neal

conceded that her "Title VII claims other than the hostile [work] environment claim[] . . . cannot

succeed."  [*Id.* at 14.] Neal did argue that genuine issues of material fact existed as to her hostile

work environment claim and that she could prevail on this claim. [*Id.*]  Defendant Ford replied in

support of its motion for summary judgment on April 30, 2009. [Doc. 26.]  For the following

reasons, the Court **GRANTS** the Defendant's motion for summary judgment.

---

[7] Following her return to Ford from her first medical leave of absence and continuing at least until the time that she took her second medical leave of absence, Neal was receiving treatment for paranoia and depression and felt a great deal of anger and mistrust towards her co-workers.  [Doc. 21, Ex. 5 at 16-17, 124 .]

Case No. 1:08-CV-1194
Gwin, J.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  "A fact is material if its resolution will affect the outcome of the lawsuit."  *Martingale, LLC v. City of Louisville,* 361 F.3d 297, 301 (6th Cir. 2004) (citing *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986))).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323 (quoting FED. R. CIV. P. 56(c)). However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts.  *See id.* at 586.  Nor can the nonmoving party rely upon the mere allegations or denials of its pleadings.  FED. R. CIV. P. 56(e).

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party.  *Thomas v. Cohen,* 453 F.3d 657, 660 (6th

Case No. 1:08-CV-1194
Gwin, J.

Cir. 2004) (citations omitted).  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)).  Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Martingale,* 361 F.3d at 301 (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.,* 96 F.3d 174, 178 (6th Cir. 1996)) (internal quotations omitted).

### III. Analysis

In its motion for summary judgment, Defendant Ford argues that it is entitled to judgment as a matter of law as to the following claims made by Plaintiff Neal:  (1) hostile work environment; (2) sex and race discrimination; and (3) retaliation.  [Docs. 21, 26.] As the Plaintiff concedes that she cannot succeed on her discrimination and retaliation claims and discusses only the hostile work environment claim in her response brief, the Court considers Ford's arguments only with respect to Neal's hostile work environment claim.

In her Complaint, Plaintiff Neal argued that she was subjected to a hostile work environment while working for Defendant Ford in its various plants. [Doc. 1.]  Ford contends that Neal cannot prevail on her hostile work environment claim because the isolated conduct she references does not satisfy Title VII's "severe or pervasive" standard. [Doc. 21 at 18.]  The Court agrees with Ford and grants its motion for summary judgment with respect to this claim.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against

-11-

Case No. 1:08-CV-1194
Gwin, J.

any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex or race created a hostile or abusive work environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir.), *cert. denied*, 522 U.S. 865, (1997). A hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal quotation marks omitted).

Under the standard adopted by the Sixth Circuit, to make out a hostile work environment claim a plaintiff employee needs to show: (1) that she was a member of a protected class; (2) that she was subjected to unwelcomed harassment; (3) that the harassment was based on sex or race; (4) that the harassment created a hostile work environment; and (5) employer liability. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999)).

If an employee establishes that a supervisor created a hostile work environment under this standard, an employer is rendered vicariously liable for the hostile work environment unless it can prove that: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). To establish employer liability for harassment by a co-worker or co-workers, a plaintiff must show that the employer "knew or should

-12-

Case No. 1:08-CV-1194
Gwin, J.

have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (internal quotation marks and citation omitted) (explaining employer liability for both co-worker and supervisor harassment); *see also* *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 50 (6th Cir. 1996) (holding that the appropriate standard in cases involving hostile work environments created by the actions of co-workers "is one of failure-to-correct-after-notice or duty to act after knowledge of harm").

The test for a hostile work environment has both objective and subjective components. *Williams*, 187 F.3d at 566.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* (citing *Harris*, 510 U.S. at 21-22); *see also* *Faragher*, 524 U.S. at 807 (reaffirming the objective and subjective components of the test for a hostile work environment). The subjective aspect of the hostile work environment test "does not require that a plaintiff report a hostile work environment." *Williams*, 187 F.3d at 566.

To objectively determine whether a hostile work environment is present, a court must consider the "totality of the circumstances," and not discrete events in isolation. *Id.* at 562. In *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999), the Sixth Circuit explained that the "totality of the circumstances" means that: (1) offensive conduct need not be directed at the plaintiff, *id.* at 660; (2) the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand, *id.* at 661; (3) racial or sexual animus can be inferred from conduct not overtly racial or sexual in nature when the context suggests it, *id.* at 662; and (4) blue collar work

-13-

Case No. 1:08-CV-1194
Gwin, J.

environments do not have more leeway when it comes to offensive conduct, *id.*  The totality of the circumstances test "mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment . . ." *Williams*, 187 F.3d at 562.

Further, to determine whether an actionable hostile work environment claim is objectively present, the court must look at "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993); *see also Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004) (holding that one incident of touching was not sufficiently frequent, severe, physically threatening, or humiliating to constitute a hostile work environment even though coupled with sexually suggestive comments); *Black*, 104 F.3d at 826 ("[S]ex-based comments need not be directed at a plaintiff to constitute conduct violating Title VII . . . [but] this fact contributes to our conclusion that the conduct here was not severe enough.").

In this case, Plaintiff Neal fails to establish that there is a genuine issue of material fact as to whether she was subjected to a hostile work environment while working at several of Defendant Ford's plants.  Viewing all the factual evidence and drawing all reasonable inferences in favor of the Plaintiff, the Court finds that the comments and other incidents that Neal states she experienced are too sporadic, unrelated, and limited in severity to objectively or subjectively constitute a hostile work environment.

Plaintiff Neal bases her hostile work environment claim essentially on eight incidents – spread out over six years and three separate Ford plants – all of which were minor and most of which

-14-

Case No. 1:08-CV-1194
Gwin, J.

did not affect her directly in any way.  In mid-2002, while she was working at the Monroe Plant, Neal alleges that her supervisor made a remark critiquing her ability to drive a forklift because she was a woman and she heard that her co-workers had made a bet that she would not be able to drive a forklift.  Neal also apparently found a queen of hearts card, a women's magazine, and a copy of Visteon's diversity policy inside her forklift.  Further, Neal indicates that she had second-hand knowledge that an unidentified employee was called a "nigger bitch" and that dog excrement was smeared on the car of an African-American employee.  Two years later, in July 2004, Neal says that she saw some racially-based graffiti while working at the Lorain plant.[8/]  About a year and a half later, while employed at the Avon Lake plant, Neal contends that racial slurs were directed at her once or twice and that she had second-hand knowledge of employees making unspecified racial remarks and stating that women belonged in a kitchen barefoot with a kid.

Not only are these remarks and incidents, if they did indeed occur, sporadic in nature – with approximately a year and a half to two years between each alleged occurrence – and very limited in their severity, but also almost none of them were reported to Ford's Labor Relations Department.[9/] Although this fact, alone, does not prove that Neal did not subjectively believe that her work environment was hostile or abusive, her own characterization of the racial- or gender-based comments that she allegedly heard, both first- and second-hand, as "trivial" and her statement that

---

[8/] Neal also apparently saw union campaign literature in a Lorain plant break room that referenced the KKK. The literature seems to denigrate, rather than support, the KKK,[Doc. 21, Ex. 5 at 4-5], however, and, as a result, the Court declines to infer racial animus from this literature.

[9/] The incidents that Neal did report were promptly investigated and addressed.  Neal did not tell anyone at Visteon or Ford about her supervisor's comments regarding her forklift driving abilities, the bet that her co-workers allegedly made regarding her forklift driving skills, or about the items that she found in her forklift.  When Neal saw the racially-based graffiti in the Lorain plant, she reported it to Ford and the graffiti was removed within two days.  Neal did not report any of the racial or gender-based comments that she allegedly heard, both first- and second-hand while working at the Avon Lake plant.

Case No. 1:08-CV-1194
Gwin, J.

she "didn't take them to heart" indicate that she did not subjectively believe her work environment

to be hostile or abusive.

Because the alleged discriminatory conduct, considered in total both objectively and

subjectively, was extremely limited in both frequency and severity and did not unreasonably interfere

with Plaintiff Neal's work performance, and as Defendant Ford promptly and adequately addressed

the few issues that Neal brought to its attention, the Court finds that Neal cannot prevail on her

hostile work environment claim.  As a result, the Court grants summary judgment in favor of

Defendant Ford on this claim.

### IV. Conclusion

For the above reasons, the Court **GRANTS** Defendant Ford's motion for summary judgment.

IT IS SO ORDERED.


Dated: May 14, 2009                           s/          *James S. Gwin*
                                              JAMES S. GWIN
                                              UNITED STATES DISTRICT JUDGE